**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:14-CV-938**

| | |
|---|---|
| **NEW BREED, INC.,**<br><br>            **Plaintiff,**<br><br>    **v.**<br><br>**CHARLES E. PIPER,**<br><br>            **Defendant.** | **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** |

## I.      INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff NEW BREED, INC. ("New Breed") seeks a temporary restraining order to prevent its former Vice President of Business Development, Defendant Charles E. Piper, from violating his promise not to compete with New Breed for seven months after resigning his employment. Piper quit his well-paid sales position at New Breed to begin working for New Breed's competitor, Fidelitone, Inc. d/b/a Fidelitone Logistics ("Fidelitone"), in contravention of his contractual obligations. Fidelitone and New Breed both provide third-party logistics to customers. New Breed seeks a temporary restraining order and preliminary injunctive relief to uphold the reasonable post-employment restrictions to which the parties previously agreed.

## II.    STATEMENT OF FACTS[1]

**A.    New Breed and Fidelitone are direct competitors in the logistics business.**

New Breed is a global third-party logistics company headquartered in High Point, North Carolina, with operations throughout the United States.  Comp. ¶¶ 2, 16, 18.  New Breed designs, implements, and operates comprehensive "supply chain" solutions for government and industry leaders, including in the telecommunications and consumer electronics, aerospace, manufacturing, retail and ecommerce, defense, government, entertainment and media, and healthcare industries.  *Id.* ¶ 2; Preliminary Injunction ¶ 2. In simple terms, a supply chain is the movement of materials and services from their source to the end user.  Aff. ¶ 2.  New Breed's logistics services are expansive and include distribution and warehousing of products, kitting (*i.e.*, compiling tools and parts in kits) and other value-added services such as product inspection and refurbishment, returns processing, technical product support, advanced planning and forecasting, network optimization, facility solutions design, and inventory management and delivery. *Id.* ¶ 4; Preliminary Injunction ¶ 2.  Fidelitone and New Breed offer competitive solutions regarding third-party logistics, reverse logistics (when products are returned), inventory

---

[1]     The Statement of Facts is supported by the Verified Complaint (the "Comp."), the Affidavit of Mike Hopkins, which is attached hereto (without exhibits) as Exhibit 1 (the "Aff."), an Order Granting Motion for Preliminary Injunction in *New Breed, Inc. v. Bowen*, Case No. 12-cvs-8231 (Guilford Cnty. Super. Ct. Nov. 20, 2012) (the "Preliminary Injunction"), which is attached hereto in Exhibit 2, and various Fidelitone statements and press releases, attached hereto as Exhibits 3-7.

Case 1:14-cv-00938-TDS-JEP   Document 5   Filed 11/10/14   Page 2 of 21

management, direct fulfillment (delivering product directly to consumers) and transportation management, among other things.[2] Comp. ¶ 4; Aff. ¶¶ 5, 8, 11-12.

Fidelitone, like New Breed, "is an industry leader in third-party (3PL) and supply chain performance that delivers value-added solutions for [its] clients." Exhibit 3 p. 1. According to Fidelitone, its "expertise includes: last mile delivery, order fulfillment, supply chain management, and transportation management." *Id.* Fidelitone, like New Breed, provides 3PL and reverse logistics support to a variety of industries, including the electronics, ecommerce, retail, manufacturing, and medical industries. *See generally* Exhibit 4. This support includes supply chain analysis and design; warehousing and warehouse management; order-management and fulfillment solutions, including direct-to-consumer fulfillment; kitting; inventory forecasting; receiving; storage; and return processing. *Id.*

New Breed and Fidelitone are direct competitors. Indeed, Fidelitone boasts that is "an industry leader in High Point, NC [in] third party logistics (3PL) and supply chain performance." Exhibit 5 p. 1. Moreover, Fidelitone is aggressively focused on expanding its logistics services. In the past six years alone, Fidelitone has merged with five companies to increase its logistics capacities. Exhibit 6 p. 1. "These mergers expand Fidelitone's service area to 33 US locations and add expertise in key industries such as" medical devices. *Id.* This expansion has brought Fidelitone to the very city where New

---

[2] For instance, New Breed manages Verizon's North America return processes, in which it receives, tests, and coordinates the repair, refurbishment, and reissuance to customers of thousands of pieces of returned wireless communication equipment each day. Aff. ¶ 5.

Breed has long been headquartered and has helped make Fidelitone one of the "nation's fastest growing private companies" and "one of North America's 50 Most Successful 3PLs." Exhibit 7 pp. 1, 3.

And Fidelitone, like New Breed, has a national footprint. Fidelitone indicates on its website that it offers logistics solutions for "1-2 day order fulfillment to 98% of the US population," advertises that it has "[o]ver 30 strategic stocking locations throughout the United States," and that it "offer[s] national 3rd party logistics services," including "electronics industry logistics services offered nationwide" and "national Retail Distribution and Logistics Services." Comp. ¶ 26.

**B.      Piper was a skilled, highly compensated New Breed employee with access to crucial, competitively valuable information and customers.**

With annual compensation exceeding $150,000, Piper was a trusted New Breed employee with access to some of the most competitively sensitive information at New Breed. *See* Agreement § 2; Comp. ¶¶ 14, 17-22. As Vice President of Business Development, Piper worked extensively with New Breed clients and prospective clients. Comp. ¶¶ 16, 18, 22.

As part of his duties, Piper worked closely with a select group of high-level New Breed employees to evaluate and formulate multimillion dollar proposals for Fortune 100 companies. Comp. ¶ 17. The proposals included, *inter alia*, New Breed's proposed services, its pricing, and its vision for achieving the desired solution (including anticipated New Breed capital investments and technological developments). *Id.* In developing these proposals, Piper learned sensitive, competitively valuable information

4

regarding New Breed's pricing, business strategy, and logistics services. *See id.* ¶¶ 17, 19-22. This is precisely the kind of legitimate business interest that a company may protect through a noncompetition agreement.

Through his work, Piper became privy to New Breed's pricing strategy and margins. Comp. ¶ 19. Because of the intensely competitive nature of the logistics industry, New Breed closely guards this information, which would allow a competitor, like Fidelitone, to undercut New Breed in servicing clients. *Id.* Only a handful of New Breed employees have access to this information. *Id.* Furthermore, Piper's access to confidential information was not limited to the clients with which he directly worked. *Id.* ¶¶ 20-22. Instead, as part of the proposal development process, Piper obtained detailed case studies regarding New Breed's efforts to resolve various clients' logistics problems. *Id.* ¶ 20. Through these case studies, Piper became familiar with different clients' business needs as well as New Breed's proprietary strategies and services. *Id.*

In fulfilling his duties as Vice President of Business Development, Piper traveled to New Breed's offices and facilities across the United States. Comp. ¶¶ 18, 22. For example, Piper traveled to New Breed's High Point headquarters to participate in proposal development meetings with other high-level New Breed employees. Comp. ¶ 22. Piper also accompanied New Breed customers and prospective customers on tours of New Breed's facilities throughout the United States, including those servicing Verizon and Boeing. *Id.* Piper was not assigned a specific geographic territory or industry segment, but traveled extensively throughout the United States, including to more than

5

thirty (30) metropolitan areas in the last two and one-half years of his employment. Comp. ¶ 18.

Through these site and customer visits throughout the United States and his work in developing business proposals, Piper obtained confidential information regarding the layout, processes, and strategic innovations at New Breed's facilities. *Id.* ¶¶ 17, 20-22. For instance, Piper was one of the few individuals privy to New Breed's strategy and procedure in operating the BASN program with Boeing. *Id.* ¶ 21. In this program, New Breed provides logistics and supply chain management of commercial aircraft fasteners, which entails, *inter alia*, forecast aggregation and capacity planning, supply base management, inbound and outbound transportation management, order processing, and product storage for as many as 300 Boeing suppliers and 20 Boeing fastener manufacturers. Comp. ¶ 21; Preliminary Injunction ¶ 28. New Breed carefully restricts access to this information, which provides a competitive advantage to New Breed. Comp. ¶ 21.

In short, Piper had access to competitively sensitive information regarding New Breed's clients, pricing, business strategies and initiatives, proprietary systems, and operational processes. Comp. ¶¶ 14, 16-22.

**C. To protect its confidential information and customer relationships, New Breed conditioned Piper's employment on the execution of a noncompetition agreement.**

In recognition of the sensitive information and customer relationships that Piper would acquire by virtue of his role at New Breed, Piper's employment was contingent

Case 1:14-cv-00938-TDS-JEP   Document 5   Filed 11/10/14   Page 6 of 21

upon his execution of a noncompetition agreement. In connection with his hiring as Vice President of Business Development, Piper entered into an Employment, Confidentiality and Non-Compete Agreement with New Breed dated June 27, 2005 (the "Agreement"). Comp. ¶ 9. New Breed's employment of Piper and its disclosure of confidential information to Piper occurred "in consideration of [Piper] signing this Agreement." Agreement Preamble. Thus, Piper agreed to maintain the confidentiality of New Breed's information and to refrain from disclosing or using any of New Breed's confidential information for his own or another's benefit without New Breed's prior written consent. *Id.* § 7. Contingent on execution of the Agreement, including its confidentiality and noncompetition provisions,[3] Piper was given access to New Breed's confidential information and was entitled to a compensation plan, including severance payments, for his employment. *Id.* Preamble; *see id.* §§ 2, 4 (describing benefits and severance).

In the Agreement, Piper promised to refrain from competitive employment for a period of seven months following termination of his employment with New Breed. Agreement § 9. More specifically, Piper promised (i) not to become employed with a "Competitor" or "Existing Customer" in the "Territory" and (ii) not to perform services for a "Competitor" or a "Customer" of New Breed for whom he performed similar services during his employment with New Breed. *Id.* For purposes of this

---

[3] Piper agreed not to disclose or utilize New Breed's confidential information or solicit its customers or employees. Agreement §§ 7-8. Piper also agreed that New Breed is entitled to injunctive relief prohibiting the use or disclosure of any confidential information acquired through his employment. *Id.* § 15.

noncompetition agreement, "Competitor" was defined as any "logistics company, third party logistics company[,] or lead logistics company," and "Existing Customer" was defined as entities for which New Breed has done work-for-hire, including providing "transportation and transportation solutions, warehousing, warehouse and inventory control, distribution, [and] outsource repair operations." *Id.* Exhibits A–B. In recognition of the global scope of the logistics services industry, the Territory was defined as states in which New Breed conducts business or its Competitors provide services competitive with New Breed. *Id.* § 9.

Piper "agree[d] that the covenants contained [in the Agreement] are reasonably necessary to protect legitimate business interests of [New Breed], are reasonable with respect to time, territory and scope, and do not interfere with the interests of the public." Agreement § 20. Under the Agreement, any provision that would otherwise "be held to be excessively broad as to time, duration or geographical scope, activity or subject[] … shall be construed by limiting" it to the extent necessary to render it enforceable. *Id.* In addition, New Breed has the right to restrict the scope of any provision in the Agreement, including specifically the noncompetition covenant, to ensure its enforceability. *Id.* § 9.

## D. Piper is violating his noncompetition agreement, necessitating injunctive relief.

Notwithstanding his contractual promises, Piper is working for New Breed's direct competitor, Fidelitone. Comp. ¶¶ 4, 27, 30. Although Fidelitone and Piper have not provided any specifics regarding Piper's duties, they admit that Piper is planning to work in sales for Fidelitone. *Id.* ¶ 30. Because Piper persists in these intentions, New Breed

8

has sought a temporary restraining order and preliminary injunctive relief as the only viable method by which to protect its interests and preserve the *status quo* pending a trial on the merits. *Id.* ¶¶ 30, 39.

## III.   ARGUMENT
### *The Court Should Issue A Temporary Restraining Order*

Preliminary injunctive relief should issue where (1) a party is likely to succeed on the merits, (2) the party is likely to suffer irreparable harm without the injunction, (3) the balance of the equities tips in the party's favor, and (4) the injunction is in the public interest. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).[4]  Given, *inter alia*, the scope of New Breed's business, Piper's high-level position at New Breed, his knowledge of and access to New Breed's sensitive and confidential information, his interactions with New Breed's customers, his current job at Fidelitone, a direct competitor, and the short duration of his noncompetition period, these criteria have been satisfied here and injunctive relief should issue.

---

[4] Similar considerations attend the issuance of temporary injunctive relief; "while a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999).  In North Carolina, injunctive relief presumptively issues where an employer establishes a likelihood of success on its claim for breach of a valid noncompetition agreement. *See, e.g.*, *A.E.P. Indus., Inc. v. McClure*, 302 S.E.2d 754, 762-64 (N.C. 1983) (explaining that "in a 'noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course'").

9

**A.** **New Breed is likely to succeed on the merits because Piper is violating a restrictive covenant that is enforceable under North Carolina law.** [5]

In North Carolina, a noncompetition covenant is valid and enforceable if it is (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer. *See Hartman v. W.H. Odell & Assoc., Inc.*, 450 S.E.2d 912, 916 (N.C. Ct. App. 1994). Each of these criteria is met here.

**(i) The covenant is in writing, part of an employment contract, and based on valuable consideration.**

As noted above, Piper entered into the noncompetition Agreement as a condition of being hired by New Breed and in exchange for a host of benefits, including a severance package. *See Precision Walls, Inc. v. Servie*, 568 S.E.2d 267, 272 (N.C. Ct. App. 2002) (explaining that "the promise of new employment is valuable consideration and will support an otherwise valid covenant not to compete contained in the initial employment contract" (internal quotation marks omitted)). This satisfies the first three criteria for enforcement. *See Keith v. Day*, 343 S.E.2d 562, 568 (N.C. Ct. App. 1986) ("It is sufficient that the covenant not to compete shows on its face a legal and valuable consideration.").

**(ii) The covenants are reasonable as to time and territory.**

A covenant's geographic and temporal restrictions must be considered in tandem when evaluating its reasonableness. *See Precision Walls*, 568 S.E.2d at 272. Hence, "in

---

[5] The Agreement is governed by North Carolina substantive law. Agreement § 17.

determining the overall reasonableness of a covenant not to compete" a court must "evaluate the geographic restriction in light of the relatively short[] . . . duration of the time restriction." *Okuma Am. Corp. v. Bowers*, 638 S.E.2d 617, 620 (N.C. Ct. App. 2007); *see also Precision Walls*, 568 S.E.2d at 273 (upholding one-year restriction). Moreover, "[a] major consideration" in determining a restriction's reasonableness as to time and territory "relates to the type of position occupied by the employee, and the skills and/or knowledge obtained by the employee." *Manpower of Guilford Cnty. v. Hedgecock*, 257 S.E.2d 109, 114 (N.C. Ct. App. 1979).

Thus, for instance, the North Carolina Court of Appeals has upheld a covenant "intended to reach the entire United States" in part because of its short duration. *Market Am., Inc. v. Christman-Orth*, 520 S.E.2d 570, 578 (N.C. Ct. App. 1999), *rev. denied*, 542 S.E.2d 213 (N.C. 2000); *see also Okuma*, 638 S.E.2d at 622 (upholding covenant established by "areas in which [Okuma America] does business," including North and South America). The Court of Appeals has likewise upheld a multistate injunction against a former employee, notwithstanding that he worked exclusively out of an office in only one state, because he was aware of information affecting business in each of the states, "such as pricing arrangements … and profit margins." *Precision Walls*, 568 S.E.2d at 273. After all, as the North Carolina Supreme Court has long recognized, "to a company actually engaged in nation-wide activities, nation-wide protection would appear to be reasonable and proper." *Harwell Enters., Inc. v. Heim*, 173 S.E.2d 316, 320 (N.C. 1970) (finding nationwide, two-year restriction reasonable).

11

Here, Piper covenanted, for seven months after leaving New Breed, to forego (i) employment by a logistics services provider (*i.e.*, a "Competitor") in states where New Breed conducts business or a Competitor provides services that compete with New Breed and (ii) the performance of services for a Customer or a Competitor for whom he performed similar services during his employment with New Breed. Agreement § 9. Given the global nature of the logistics services business, the company-wide confidential information to which Piper had access, including his knowledge of New Breed's pricing, strategic initiatives, and customer requirements, and the relative brevity of the temporal restraints, these covenants are reasonable. *Id.*; Comp. ¶¶ 2, 14, 16-22. ***Indeed, these very covenants have been upheld by the North Carolina courts, after full adversarial hearings.*** *See* Exhibit 2, Order Granting Motion for Preliminary Injunction, *New Breed, Inc. v. Bowen*, No. 12-cvs-8231 (Guilford Cnty. Super. Ct. Nov. 20, 2012); Order on Plaintiff's Motion for Temporary Restraining Order and Expedited Discovery, *New Breed, Inc. v. Smallwood*, No. 11-cvs-1346 (Guilford Cnty. Super. Ct. Aug. 11, 2011).

In sum, the restrictions at issue in this case are well within the parameters of permissible restrictions, particularly given Piper's role at New Breed, through which he obtained extensive, sensitive information regarding New Breed's business and customers. *See, e.g.*, *Moskin Bros., Inc. v. Swartzberg*, 155 S.E. 154, 157 (N.C. 1930) (concluding that an employee's two-year noncompetition agreement was reasonable, in part because "[i]t is obvious that in the performance of his duties . . ., the employee acquired an intimate knowledge of his employer's business"); *Precision Walls*, 568 S.E.2d at 273

(observing, in upholding employee's multistate restraint, that a "one year time restriction is well within the established parameters for covenants not to compete"); *see also Triangle Leasing Co., Inc. v. McMahon*, 393 S.E.2d 854, 858 (N.C. 1990) (holding that two-year restriction was reasonable and enforceable based on former employee's "access to customer lists, price sheets, and policies affecting company business"); *Keith*, 343 S.E.2d at 568 (observing that a two-year covenant was reasonable to protect plaintiffs' "knowledge of the hardware business and the particular inner workings and business practices").

### (iii)  The restrictions protect New Breed's legitimate business interests.

Noncompetition covenants will be enforced when they are reasonably necessary to protect a legitimate business interest, *Beasley v. Banks*, 368 S.E.2d 885, 886 (N.C. Ct. App. 1988), including when an employee's job enables "him to acquire valuable information as to the nature and character of the business," *A.E.P. Indus., Inc. v. McClure*, 302 S.E.2d 754, 763 (internal quotation marks omitted); *see also United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 380, 382 (N.C. 1988) (explaining that "intimate knowledge of the business operations" can be used by former employees to unfairly compete against their former employers).

Here, Piper's position and knowledge, combined with the global scope of New Breed's logistics services business, supports enforcement of his brief noncompetition covenant.  Comp. ¶¶ 2, 14, 16-22.  As detailed above, Piper had access to New Breed's confidential information, including its pricing, margins, client information, and business

13

strategy and capital investments.  This competitively sensitive information is precisely the type of "valuable information as to the nature and character of [New Breed]" that justifies enforcement of a covenant not to compete.  *Kuykendall*, 370 S.E.2d at 380-81 (internal quotation marks omitted); *see also, e.g.*, *Precision Walls*, 568 S.E.2d at 273 (holding that protection of "information and knowledge garnered from [former employee's] employment" is legitimate business interest); *Keith*, 343 S.E.2d at 568 (explaining that protection of "knowledge of the hardware business and the particular inner workings and business practices" is a legitimate interest).

Nor is Piper's covenant overbroad.  Under North Carolina law, a restrictive covenant can properly "prohibit employment of any kind . . . with a direct competitor." *Precision Walls*, 568 S.E.2d at 273.  The covenant here is no broader than necessary to protect New Breed's legitimate interests.  *See, e.g.*, *Moskin*, 155 S.E. at 157.  First, the restriction is only for seven months – "well within the established parameters for covenants not to compete," *Precision Walls*, 568 S.E.2d at 273 – and such a brief period supports a broader restriction, *see McClure*, 393 S.E.2d at 858.  Second, Piper was privy to highly confidential, competitively crucial information.  Comp. ¶ 14.  Piper not only knows New Breed's pricing strategy and margins, but he also is one of a limited number of individuals privy to the intricacies of New Breed's BASN program and proprietary direct fulfillment procedures.  *Id.* ¶¶ 17, 19-22.  Moreover, Piper has long-term, established relationships and extensive interactions with New Breed customers and prospective customers.  *Id.* ¶ 16.  Given his duties and knowledge of sensitive New Breed

information, Piper's restrictive covenant is reasonable and necessary to protect New Breed. *See, e.g.*, *Precision Walls*, 568 S.E.2d at 273 (explaining that the danger of disclosure of protected information and knowledge arises from *employment* with a direct competitor rather than the particular *position* at the competitor).

Finally, Piper is only restricted from working for Competitors and New Breed customers in states where New Breed operates or the Competitor provides services competitive to New Breed, and from providing services New Breed customers that are similar to those he performed while employed by New Breed. Agreement § 9. Particularly given the brevity of the restriction and the global, intensely competitive nature of logistics services work, Comp. ¶ 2, this restriction is narrowly drawn to protect New Breed's interests. *See Okuma*, 638 S.E.2d at 622 (restriction precluding employment with direct competitor throughout North and South America); *Harwell*, 173 S.E.2d at 320-21 (two-year, nationwide restriction); *see also Precision Walls*, 568 S.E.2d at 273 (concluding that "plaintiff's legitimate business interest allows the covenant not to compete to prohibit employment of any kind by defendant with a direct competitor"); *Kinesis Adver., Inc. v. Hill*, 652 S.E.2d 284, 294 (N.C. Ct. App. 2007) (upholding prohibition of "conducting business . . . of the type similar to that of [the employer] for two years").

To be sure, North Carolina courts have frowned upon covenants that are overly expansive, particularly for employees with confined duties and limited access to competitively sensitive information. In *VisionAIR, Inc. v. James*, 606 S.E.2d 359 (N.C.

Ct. App. 2004), for instance, the court upheld the denial of injunctive relief preventing a "software architect" from working for two years in any "business similar to" his prior employer's. *Id.* at 361. For multiple, independent reasons, *VisionAIR* does not address the covenant here. To begin with, Piper's covenant is distinguishable from the covenant in *VisionAIR*. In particular: (1) the covenant here is for seven months, not two years; (2) the covenant here, but not in *VisionAIR*, precludes the employee from providing "similar services" to a competitor; and (3) here, the covenant precludes work for a defined "Competitor," including specifically, a third-party logistics business, whereas in *VisionAIR* the covenant simply precluded participation in "any business similar to Employer's." *VisionAIR*, 606 S.E.2d at 361; Agreement § 9 & Exhibit A. Furthermore, as the North Carolina Court of Appeals recently explained, where an employee (1) has "responsibility for customer contacts," (2) has "responsibility for developing client-specific pricing proposals or adjusting prices for competitive reasons," or (3) "was involved in the development and operation of his employer's bidding or pricing strategies," the *Precision Walls* outright ban on employment with a competitor is the relevant measure by which to judge the reasonability of the noncompetition covenant. *See CopyPro, Inc. v. Musgrove*, 754 S.E.2d 188, 193-94 (N.C. Ct. App. 2014). By contrast, the *VisionAIR* paradigm applies in situations where an employee does not have access to such high-level, competitively sensitive confidential information. *Id.* Therefore, in light of Piper's knowledge of and involvement in "developing client-specific pricing proposals," his "responsibility for customer contacts," and his

16

involvement in New Breed's "bidding or pricing strategies," Piper's brief noncompetition covenant is enforceable. *See, e.g.*, Comp. ¶¶ 14, 16-20 & Exhibit 2 (outlining Piper's job responsibilities).

### (iv)  Piper's employment with Fidelitone violates his noncompetition covenant.

Piper's noncompetition covenant protects New Breed's legitimate and important interests, including its confidential information, its relationship with its customers, and its business and competitive interests in the marketplace.  Notwithstanding the importance of this covenant – which he acknowledged in the Agreement, *id.* § 20 – Piper seems intent on flouting his noncompetition obligations by working in sales at Fidelitone, New Breed's competitor, in the same geographic location out of which he worked for New Breed.  Comp. ¶ 30.  This violates Piper's noncompetition covenant, and New Breed is entitled to prevent Piper from engaging in this competition.  *See Precision Walls*, 568 S.E.2d at 273 (concluding that "plaintiff's legitimate business interest allows the covenant not to compete to prohibit employment of any kind by defendant with a direct competitor" in any state where "he was aware of information affecting business").

### B.  New Breed is likely to suffer irreparable harm without the injunction.

As the Fourth Circuit has recognized, irreparable injury occurs where "monetary damages are difficult to ascertain or are inadequate."  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal quotation marks omitted).  New Breed cannot adequately quantify the damage it will suffer if Piper is allowed to work at its competitor for seven months.  The only effective

17

remedy, in such situations, is injunctive relief. *See id.* at 551-52 (recognizing irreparable harm in the "possibility of permanent loss of customers to a competitor"). Furthermore, under North Carolina law, an employee's acknowledgment of the inadequacy of remedies at law and the necessity of injunctive relief – as acknowledged by Piper, *see* Agreement §§ 15, 20 – is evidence of the inadequacy of monetary damages and the corresponding necessity of injunctive relief. *See McClure*, 302 S.E.2d at 762; *see also Amdar, Inc. v. Satterwhite*, 246 S.E.2d 165, 168 (N.C. Ct. App. 1978) (affirming preliminary injunction and noting that "defendant acknowledged in . . . the employment agreement that irreparable injury would result from a breach by him of the agreement"), *rev. denied*, 248 S.E.2d 249 (N.C. 1978). Additionally, when, as here, a former employee has acquired "valuable information as to the nature and character of the business," the "potential harm" to an employer from a breach of a noncompetition provision warrants injunctive relief. *QSP, Inc. v. Hair*, 566 S.E.2d 851, 854 (N.C. Ct. App. 2002) (internal quotation marks omitted). North Carolina federal courts likewise recognize the irreparable harm inherent in such circumstances. *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 711 (M.D.N.C. 2009) (recognizing that "loss of proprietary information may constitute irreparable harm").

## C.     The equities favor New Breed, which – to protect its confidential information and customers – seeks only to hold Piper to his contractual promises.

In these circumstances, the equities favor New Breed. New Breed asks only that Piper comply with promises that he made, no more and no less. If he does not, New Breed will suffer harm for which it cannot obtain a remedy. *See Campbell Alliance Grp.,*

18

*Inc. v. Dandekar*, No. 5:13-cv-415, 2014 WL 51241, at *4 (E.D.N.C. Jan. 7, 2014) (finding equities favor employer in such circumstances).

**D.    Issuing a restraining order serves the public interest.**

Enforcing valid contracts serves the public interest, particularly where confidential information and legitimate business interests, like customer relationships, are at stake. *See Wilmar, Inc. v. Corsillo*, 210 S.E.2d 427, 430 (N.C. Ct. App. 1974) (explaining that the law "favors the enforcement of contracts intended to protect legitimate interests" and observing that "[i]t is as much a matter of public concern to see that valid engagements are observed as it is to frustrate oppressive ones" (internal quotation marks omitted)); *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 448 (W.D.N.C. 2002) ("The public has an interest in ensuring that contracts are enforced."). Therefore, injunctive relief is in the public interest. *See Pashby*, 709 F.3d at 330 (concluding that likelihood of success can satisfy public interest prong so long as "other considerations d[o] not meaningfully weigh on that factor").

### IV.    CONCLUSION

A primary purpose of a noncompetition covenant is to provide a former employer sufficient time to adjust to the loss of an employee and the new competitive threat that employee poses. Particularly when that period is short – as it is here – the only effective way to achieve the benefit of that bargain is to secure injunctive relief when the employee fails to abide by the covenant. Charles Piper made an enforceable promise and should be held to it. For the foregoing reasons, therefore, New Breed respectfully requests that the

19

Court grant its motion, issue a temporary restraining order prohibiting Piper from violating his Agreement, and award such other and further relief as the Court, in its discretion, deems proper.

This 10th day of November, 2014.

/s/ David C. Wright, III
David C. Wright, III (N.C. Bar No. 11161)
Douglas M. Jarrell (N.C. Bar No. 21138)
Sinéad N. O'Doherty (N.C. Bar No. 38402)
dwright@rbh.com; djarrell@rbh.com;
sodoherty@rbh.com
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246-1900
Telephone: (704) 377-2536
Facsimile: (704) 378-4000
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I also certify that I have mailed the foregoing via Federal Express and first class mail, postage prepaid, to Defendant at the following address:

> Mr. Charles E. Piper
> 920 Mockingbird Drive
> Antioch, IL 60002

In addition, I certify that I sent a copy of the foregoing via email, Federal Express, and first class mail, postage prepaid, to the following:

> Mr. James J. Interlandi, Esq.
> 1759 W. Wellington, Suite 4000
> Chicago, IL 60657
> Jim@VirtualGC.net
> *Attorney for Defendant Piper*

*/s/ David C. Wright, III*
David C. Wright, III